# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:09-cr-125 |
| ARTHUR R. CLAUS, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are numerous pretrial motions filed by Defendant:

MOTION TO SUPPRESS (Document No. 25);

MOTION FOR DISCOVERY (Document No. 27);

MOTION FOR EARLY DISCLOSURE OF ALL JENCKS ACT MATERIAL (Document No. 29);

MOTION REQUESTING NOTICE PURSUANT TO RULE 404(B) (Document No. 30);

MOTION TO COMPEL DISCLOSURE OF PLEA BARGAINS, PREFERENTIAL TREATMENT, AND PROMISES TO GOVERNMENT WITNESSES (Document No. 31); and

SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE (Document No. 47).

Defense counsel has also submitted briefs in support of the motions. The government filed an omnibus response to the original motions (Document No. 36) and a separate response to the Supplemental Motion to Suppress Evidence (Document No. 50).

Both parties have filed multiple motions for extensions of time.[1] The hearing on suppression of evidence was originally scheduled in July 2009, but was postponed numerous times. Eventually, the Court held a suppression hearing on March 24, 2010. At Defendant's request, the Court permitted further post-hearing briefing. The official transcript was filed on May 5, 2010. Both sides again filed numerous requests for extensions of time. The government's reply brief on the suppression motion was due August 9, 2010 but was not filed

---

[1] The Court is not being critical of this apparent delay. Indeed, the Court is aware of defense counsel's extensive efforts in another significant case on its docket and Arthur Claus has remained free on bond during the interim.

until August 23, 2010.² Needless to say, the issues are ripe for disposition.

Factual and Procedural Background

Claus is charged in a one-count indictment with possession with intent to distribute less than 50 kilograms of marijuana, on or about February 23, 2009, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). The charge arose out of a "knock and talk" encounter with Defendant's live-in partner, Karen Henderson, on February 23, 2009 and a subsequent search of Claus' home and property.

      A.      Motions to Suppress Evidence

Defendant contends that all evidence found in his home at 1123 James Street, Turtle Creek, Pennsylvania should be suppressed because the search was warrantless and non-consensual. Defendant's supplemental motion contends that evidence derived from a search of Defendant's truck and trailer pursuant to a search warrant obtained on February 25, 2009 should also be suppressed as "fruit of the poisonous tree."

      1.      Factual Findings

At the suppression hearing, Thomas Dunlevy, a police Sergeant for the City of Duquesne assigned to a DEA taskforce, Swissvale police officer Charles Watson, West Homestead police officer Herbert Strobel, investigator Barry Fox, and Karen Henderson, Defendant's long-time partner, testified. There are two significant interactions that must be evaluated: (1) the initial "knock and talk" exchange between the officers and Ms. Henderson which resulted in their entry into the home; and (2) the subsequent obtaining of a written consent form executed by Defendant Arthur Claus.

Officers Dunlevy, Strobel and Vijay Nemani chose to engage in a "knock and talk" at Defendant's home on February 23, 2009 because they suspected that Claus was engaged in

---

²The Court granted Defendant's motion to strike this reply brief as untimely.

2

illegal drug activity. They did not have a search warrant. The officers knew that Claus was born in 1959 and had two prior drug convictions in Phoenix and St. Louis. They were dressed in plain clothes but had necklace-type badges that identified them as police officers. The officers had conducted a short surveillance, which disclosed that a dark truck had recently been parked in the driveway. They had also reviewed the property description and knew that it was a large lot which contained outbuildings. They did not know whether Claus was at home.

The house has two stories and has a large, fenced-in front porch (22' x 70"). It is located below street level and to approach the front door, the officers were required to proceed down a narrow, steep, twelve-foot concrete staircase. At the time of the initial encounter, approximately 4:20 p.m., two large German Shepard dogs were on the front porch barking. Ms. Henderson came outside and the officers identified themselves and asked to speak to Arthur Claus. Ms. Henderson is a short, gray-haired, soft-spoken lady appearing to be in her fifties in age. There is no evidence that Henderson has a criminal record or had any previous encounters with law enforcement agents. Henderson and Claus had lived together at the home for ten years or so. Henderson stated that Claus was not home and that she did not know when he would return. She offered to take their phone number and have Claus call them. Ms. Henderson took the dogs inside and came back to the door. While Ms. Henderson was inside, all of the officers moved from the top of the staircase down onto the porch near the door. The officers persisted in asking her questions. Henderson was evasive and again denied that Claus was home. She denied knowing who owned the truck parked in their driveway. It was a cold and windy day. Dunlevy asked to speak to her inside the home to keep his notes/papers from blowing. The officers testified that Ms. Henderson invited them to come in. Ms. Henderson testified that she did not invite them in, but rather that the officers kept walking towards her and, before she realized it, they were inside.

The Court finds that Ms. Henderson's testimony is not entirely credible. The Court credits Ms. Henderson's testimony that she was nervous, upset and scared. On the other hand, despite Henderson's denial at the suppression hearing some thirteen months after the encounter, the Court finds that she consented to the entry of the officers into her home.

3

Once inside, the officers testified that they detected an odor of unburnt marijuana, saw a "High Times" marijuana magazine on the table, and noticed a clear, knotted plastic baggie on the corner cabinet. The officers continued to talk to Henderson, and believed from her answers and demeanor that she was not being forthcoming. At approximately 4:30 p.m., after again being asked who owned the truck in the driveway, Henderson pointed at the ceiling (upstairs) and whispered "He's up there."

The officers drew their weapons and shouted for Claus to come down. He did so, although his demeanor was angry and he used profanity. Claus is 5"9" tall, weighs 220 pounds and was 49 years old at the time of the incident. The officers re-holstered their weapons. Claus was agitated and demanded to know why the officers were in his home. They explained that Henderson had let them in (to which she nodded her head in agreement) and that they wanted to talk about his suspected drug activity.

After a tirade about drug problems in the vicinity, Claus demanded that the officers leave the house and get a warrant if they wanted to search. Dunlevy responded that it was highly likely that he would be able to obtain a warrant, although a judge would make the final decision, that it would take several hours to do so, and that the property would have to be secured by police in the interim. Claus commented that the officers were probably "buddy-buddy" with the judge, who would likely sign a warrant. Dunlevy also stated that Claus should "Man up," i.e., tell the truth and take responsibility. Officers Strobel and Nemani conducted a sweep of the property for officer safety. Dunlevy stayed with Claus and presented the idea of "consent" to save time. Claus also raised a concern about the officers planting evidence in the home or on the property. Dunlevy offered to allow Claus to walk around and observe the officers as they conducted the search and Claus agreed. Dunlevy further stated that a search pursuant to warrant could tear up the house, but that if Claus consented, the house would not be torn up, the dogs would not be put in a kennel, and Henderson would not go to jail. The Court finds that Dunlevy did not make any affirmative misrepresentations to Claus. Eventually, Claus agreed to consent to a search of the premises. Accordingly, Dunlevy advised Claus of his rights, and attempted to read the written consent form to him. However, Claus interrupted him and stated: "Just give me the fucking

4

thing, buddy, I know what I'm doing."[3] Claus then personally signed the consent form. The Court finds that neither Henderson nor Claus had been arrested or taken into custody prior to the execution of the consent form.

The search lasted approximately three hours and included additional officers who were called in for assistance. It began in an outbuilding. Claus accompanied two officers, while Dunlevy and Henderson remained in the home. Henderson then asked if she could leave to go bowling. After the officers performed a quick sweep of the upstairs, Henderson was permitted to shower and change clothes. She left around 6:30 p.m. and returned home late that evening, after the officers had gone. Telephone records show that Henderson did not make any calls to anyone while she was out that evening. Claus was taken into custody at the conclusion of the search at approximately 8:15 p.m.

    2.    Legal Analysis

"The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). The government has the burden to prove that consent was given, and "mere submission to a claim of lawful authority" does not constitute consent. *Florida v. Royer*, 460 U.S. 491, 497 (1983). Whether consent is "voluntary" is determined by the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). Factors include the physical setting, the length of the encounter, the parties' verbal and nonverbal actions, and the age, intelligence and educational background of the person who gave consent. *United States v. Crandell*, 554 F.3d 79, 88 (3d Cir. 2009). However,

---

[3]There is a discrepancy regarding timing. Dunlevy's report stated that the consent form was signed at 4:40 p.m. and he believed at the time that it was accurate. Phone records, however, indicate that a call to the United States Attorney's office about drafting a search warrant was made at 5:07 p.m. The parties have discussed a possible stipulation or supplemental evidence, but nothing has been filed. The Court finds that the interaction between the officers, Henderson and Claus lasted longer than the twenty minutes estimated by officers before Claus signed the consent form, but there does not appear to have been any deliberate attempt to falsify the times set forth in the report.

5

consent "may be express or implied, and need not be knowing or intelligent." *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) (citation omitted). Consent "may be given unintentionally and without knowledge of the right to refuse consent, and the police are not required to warn an individual of the right to refuse consent." *Id.*

Defendant argues that Henderson's will was overborne, such that the officers' entry into the home was improper. There were three armed, plain clothes police officers present, although their guns were not drawn; Henderson was not explicitly told that she did not have to let officers in; the officers did not believe Henderson's statement that Claus was not there and questioned her persistently; officers went from the staircase area onto the front porch without express invitation; the officers' request to go inside out of the cold wind was likely a ruse. Nevertheless, these factors, in light of the totality of the circumstances of this case, did not render Ms. Henderson's consent invalid. *See Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003) (noting that officers are entitled to use the "knock and talk" strategy). It was still daylight. Henderson freely put the dogs inside and returned to converse with the officers. The officers presented their request to come inside the home in the form of a question, rather than as a command. The Court has found that Ms. Henderson gave a clear, verbal assent for the officers to enter. In particular, the Court is persuaded by the officers' testimony that Claus asked them how they came to be in the house; that the officers replied that Henderson had let them in; and that she confirmed this by nodding her head. Henderson's later actions in asking whether she could leave, shower and go bowling for the evening also indicate that she maintained her ability to think, act and make cogent decisions on her own behalf throughout the encounter. The Court is not particularly enamored with the "knock and talk" tactic, as it is susceptible to abuse by over-zealous officers and may take advantage of the hospitality of citizens. Nevertheless, the Court concludes that under the totality of the facts and circumstances of this case, the officers were entitled to rely on Henderson's assent for them to enter the home.

The consent to search the property ultimately given by Defendant Claus was also "voluntary," as defined by legal precedent. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), the United States Supreme Court explained that the question of whether consent was a product of duress or coercion is a question of fact to be determined from the totality of the

6

circumstances. In *United States v. Sebetich*, 776 F.2d 412, 425 (3d Cir. 1985), the Court observed that a police officer's statement that, absent consent, he would seek to obtain a search warrant, "would not militate at all against a finding of voluntary consent." The Court believes that Officer Dunlevy likely engaged in a "sales job" to make the alternative of consenting to search more attractive to Claus than the option of forcing the officers to obtain a search warrant. Dunlevy attempted to persuade Claus by pointing out the potential inconvenience and distasteful impacts which the execution of a search warrant may have on the property, the dogs, and Ms. Henderson if the officers were required to proceed in that manner. The Court recognizes the inconvenience and disruption that Claus would have had to endure for the several hours it would have taken for the officers to secure a search warrant and that they intended to stay at his home – ostensibly to secure the premises and prevent the destruction of evidence – in the interim. On the other hand, Claus is a physically large, mature adult, with previous experience in having to deal with law enforcement officers.[4] He demonstrably knew how to invoke his right to refuse consent (and had previously done so), yet he ultimately made a knowing and informed decision to sign a written consent form and permit a search. Indeed, Dunlevy and Claus negotiated a number of the terms under which the search would be conducted. Claus' belligerent and assertive conduct throughout the incident demonstrated that his consent was not the product of intimidation by officers. The Court recognizes that the actions of the officers in this case were somewhat aggressive and that they certainly attempted to influence and persuade Claus to obtain his consent. In *Sebetich*, 776 F.2d at 425, the Court of Appeals commented that agents were permitted to engage citizens in a "fair and sensible appraisal of the realities of the situation." The Court concludes that under the totality of the facts and circumstances of this case, the officers did not cross the line of impermissible duress and coercion. As the initial search of the home and property on February 23, 2009 is found to have been lawful, the Court need not address whether the results of the search of the truck and trailer on February 25, 2009 pursuant to warrant should

---

[4]The Court is not giving any weight to the police reports from Claus' prior drug-related convictions in Phoenix and St. Louis, but recognizes that Claus was not totally unfamiliar with confrontational situations involving police.

be suppressed. Accordingly, the MOTION TO SUPPRESS (Document No. 25) and SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE (Document No. 47) will be **DENIED**.

B. Discovery Motions

Several pending motions are evidentiary in nature. Defendant seeks disclosure of statements made by him and/or alleged co-conspirators, criminal records, physical evidence to be used, statements of witnesses, test reports, and *Brady* material (Doc. # 27); production of Jencks Act materials at least fourteen (14) days prior to trial (Doc. # 29); Rule 404(b) evidence (Doc. # 30); and the names, plea bargains and related treatment of potential witnesses (Doc. # 31).

Discovery in a criminal case is far different from that in a civil case. The government's obligation to make available pretrial discovery materials is governed primarily by Rule 16 of the Federal Rules of Criminal Procedure. Beyond Rule 16, the Jencks Act, and *Brady* and its progeny, however, a defendant has no general constitutional right to pretrial discovery. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Those rights conferred by rule, statute, and case law cannot be used to compel the United States to disclose the minutia of its investigation, evidence, witnesses and/or trial strategy. *United States v. Fiorvanti,* 412 F.2d 407, 411 (3d Cir.), *cert. denied,* 396 U.S. 837 (1969). The United States Court of Appeals for the Third Circuit has recognized that discovery in criminal cases is limited to those areas listed in Federal Rule of Criminal Procedure 16(a)(1), "with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *United States v. Ramos,* 27 F.3d 65, 68 (3d Cir. 1994). Generally, these other areas are limited to the Jencks Act and materials available pursuant to the *Brady* doctrine. *Id.*

At the outset, the Court notes that the government has repeatedly acknowledged its obligations under *Brady* and its progeny, *Giglio*, Federal Rules of Criminal Procedure 12 and 16, and the Jencks Act. The government has also made the following representations: (1) that it is willing to cooperate with any reasonable request by Defendant; (2) that it is unaware of any exculpatory *Brady* material pertaining to Defendant; (3) that it will voluntarily turn over Jencks

Act materials in its possession at least three (3) days prior to trial; (4) that it will turn over "impeachment" materials regarding its witnesses at the same time it discloses Jencks Act materials; (5) that it has already provided the only written statement from Claus (the consent form) and the oral statements made by Claus; (6) that it has provided Claus' criminal history; (7) that the physical evidence has been continuously available for review; (8) that it will provide copies of the relevant test reports; (9) that expert reports will be provided at least two weeks prior to trial; and (10) that it will provide "prior bad act"/ Rule 404(b) evidence at least two weeks prior to trial. The government objects to the early disclosure of its witnesses and generally objects to any expansion of its discovery obligations. The government argues that the admissibility of any 404(b) evidence should be determined at trial.

The Court recognizes that it cannot compel the government to make early disclosures of its Jencks and *Brady* materials to Defendant. On the other hand, as the government acknowledges, strict compliance with the Jencks and *Brady* time limits will likely cause delays in starting trial, depending upon the scope of the government's disclosures. The Court will hold the government to its representation that Jencks and *Brady* material will be disclosed at least three (3) days prior to trial - but it regards that offer to be unreasonable. The Court encourages the government to voluntarily accommodate defense counsel's reasonable request that such materials be produced at least fourteen (14) days prior to trial.

In addition, the government's proposal to produce its expert reports only two weeks prior to trial is unreasonable. There is no explicit deadline in Fed. R. Crim. P. 16(a)(1)(G) for disclosure of the summaries of expert witnesses. However, such disclosures must be provided with sufficient time to enable Defendant to obtain counter-experts, if desired, and for the parties and the Court to resolve any *Daubert*-type or other challenges in advance of trial. Accordingly, pursuant to its authority in Fed. R. Crim. P. 12(c) to set deadlines for pretrial motions and to schedule hearings regarding same, the Court will direct the following schedule for the disclosures and motions regarding expert testimony:

9

| Description re Disclosure of Government Trial Experts | Disclosure / Filing Dates |
|---|---|
| Government to identify trial experts and make Rule 16(a)(1)(G) disclosures | 56 days prior to trial |
| Defendant to file motion(s) to challenge government's expert opinion(s) and/or qualifications | 42 days prior to trial |
| Government to file response(s) to Defendant's challenge(s) | 35 days prior to trial |

| Description of Disclosure re Defendant's Trial Experts | Disclosure / Filing Dates |
|---|---|
| Defendant to identify trial experts and make Rule 16(b)(1)(C) disclosures | 35 days prior to trial |
| Government to file motion(s) to challenge Defendant's expert opinion(s) and/or qualifications | 28 days prior to trial |
| Defendant to file response(s) to government's challenge(s) | 21 days prior to trial |

The Court will endeavor to hear and rule upon any *Daubert*-type motions as expeditiously as possible, in order to provide the parties with an opportunity to adjust their trial preparations to comport with the Court's rulings. In all other respects, the Court concludes that the government's objections to expansions of its discovery obligations are well-taken.

An appropriate Order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) 2:09-cr-125 |
| ARTHUR R. CLAUS, | ) |
| Defendant. | ) |

## MEMORANDUM ORDER

AND NOW, this 8th day of September, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that:

the MOTION TO SUPPRESS (Document No. 25) is **DENIED**; the SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE (Document No. 47) is **DENIED;** the MOTION FOR DISCOVERY (Document No. 27) is **GRANTED IN PART in accordance with the government's representations AND DENIED IN PART**; the MOTION FOR EARLY DISCLOSURE OF ALL JENCKS ACT MATERIAL (Document No. 29) is **DENIED** and such evidence shall be provided to Defendant at least three days prior to the commencement of trial; the MOTION REQUESTING NOTICE PURSUANT TO RULE 404(B) (Document No. 30) is **GRANTED**, and such evidence shall be provided to Defendant at least two weeks prior to the commencement of trial or at the time the Jencks Act materials are provided, whichever is sooner; and the MOTION TO COMPEL DISCLOSURE OF PLEA BARGAINS, PREFERENTIAL TREATMENT, AND PROMISES TO GOVERNMENT WITNESSES (Document No. 31) is **DENIED**.

The parties shall comply with the following schedule for the disclosures and motions regarding expert testimony:

| Description re Disclosure of Government Trial Experts | Disclosure / Filing Dates |
|---|---|
| Government to identify trial experts and make Rule 16(a)(1)(G) disclosures | 56 days prior to trial |
| Defendant to file motion(s) to challenge government's expert opinion and/or qualifications | 42 days prior to trial |
| Government to file response(s) to defendant's challenge(s) | 35 days prior to trial |

| Description of Disclosure re Defendant's Trial Experts | Disclosure / Filing Dates |
|---|---|
| Defendant to identify trial experts and make Rule 16(b)(1)(C) disclosures | 35 days prior to trial |
| Government to file motion(s) to challenge Defendant's expert opinion and/or qualifications | 28 days prior to trial |
| Defendant to file response(s) to government's challenge(s) | 21 days prior to trial |

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Amy L. Johnston, AUSA
Email: amy.johnston2@usdoj.gov

Caroline M. Roberto
Email: croberto@choiceonemail.com